ROBERT WISNIEWSKI (RW-5308)
ROBERT WISNIEWSKI P.C.
Attorneys for Plaintiffs
225 Broadway, Suite 1020
New York, NY 10007
(212) 267-2101

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------X

DANIEL BIELSKI, TADEUSZ NIEDBALA, et.al.
on behalf of themselves and others similarly situated,

Plaintiffs,

**Docket No.:06-6542 (BMC) (VVP)**

-against-

ROYAL PLUMBING & HEATING CORP., DANCO, INC., DANIEL J. RACAN, MILAN RACAN, WLADYSLAW LISOWIEC and KAZIMIERZ PLACHTA,

Defendants.

-----------------------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE GLENN PANNENBORG AS EXPERT**

# TABLE OF CONTENTS


PAGE

Table of Authorities....................i

Index of Exhibits....................ii

I. Preliminary Statement....................1

II. Statement of Facts....................3

A. Relevant Facts....................3
B. Discovery Provided by Plaintiffs and Pannenborg to Defendants ......8
C. Pannenborg's Qualifications to Render an Expert Report....................9
D. The Reliability of Pannenborg's Methodology....................10

III. Argument....................12

1. General Principles....................12
2. Pannenborg is Qualified as an Expert to Proffer an Expert Report....................13
3. Pannenborg's Reports are the Type Susceptible to Expert Testimony....................16
4. Defendants Do Not Question Pannenborg's CPA Designation and Pannenborg's CV Was Substantially Accurate ....................19
5. The So-Called Hearsay Evidence Does Not Undermine Pannenborg's Reports....................20
6. Pannenborg's Reports are Reliable....................22
7. Defendants' Claim that the Jury would be Unduly Prejudiced is Unsupportable....................23

IV. Conclusion....................24

# TABLE OF AUTHORITIES

**CASES:** **PAGE:**


*Ayers v. SGS Control Services, Inc.,*
2007 WL 3171342 at *1 (S.D.N.Y.,October 09, 2007)....................................16
*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995)
*cert. denied*, 517 U.S. 1229, 116 S.Ct. 1869, 134 L.Ed.2d 966 (1996)............12
*Boucher v. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2nd Cir.,1996)......................23
*Cox v. NAP Const. Co., Inc.*,
2008 WL 2276160 (Ct. Apps., June 5, 2008)..................................................4,6
*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993)..................12,17
*Great Northern Ins. Co. v. Power Cooling, Inc.*,
2007 WL 4688411 at *6 (E.D.N.Y.,December 18, 2007)...............................12
*Grochowski v. Phoenix Const.*
318 F.3d 80 (2nd Cir., 2003) ...............................................................4
*Hnot v. Willis Group Holdings, Ltd.*,
2007 WL 1599154 at *3 (S.D.N.Y., June 1, 2007)..........................................23
*Ho v. Ernst & Young LLP*,
2008 WL 619029 (N.D.Cal., March 4, 2008)...................................................9
*King v. Brandtjen & Kluge, Inc.*,
2001 WL 1804345 (W.D.N.Y., June 20, 2001)...............................................15
*Kumho Tire v. Carmichael*, 526 U.S. at 142, 119 S .Ct. at 1171....................12
*MacQuesten General Contracting, Inc. v. HCE, Inc.*,
2002 WL 31388716 at *2 (S.D.N.Y., October 22, 2002)...............................16,20,23
*Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*,
2009 WL 875553 at *11-13 (E.D.N.Y., March 20, 2009)..............................16,17,21
*Nisanov v. Black & Decker (U.S.) Inc.*,
2008 WL 906708 (April 3, 2008 E.D.N.Y.)...................................................12,15
*Olindo Enterprises, Inc. v. City of Rochester*,
2008 WL 6862594 (W.D.N.Y., 2008) ...........................................................23
*Powell v. Carey International, Inc.*, 2007 WL 1068487
(S.D. Fla., April 9, 2007) ...........................................................................17
*Smith v. Jacobs Engineering Group, Inc.*,
2008 WL 1805373, (N.D.Fla., April 18, 2008).................................................19
*Sobczak et al. v. AWL Industries, Inc. et al.*, 07 cv 1226
(BMC)(RER)...............................................................................................5
*Square D Co. v. Breakers Unlimited, Inc.*,
2009 WL 1468700 at *1 n.1 (S.D.Ind., May 21, 2009)..................................16
*Tewksbury v. Dowling*, 169 F.Supp.2d 103, 112 (E.D.N.Y., 2001)................20
*U.S. v. Lombardozzi*, 491 F.3d 61, 73 (2nd Cir., 2007)..................................21
*United States v. Jakobetz*, 955 F.2d 786, 797 (2nd Cir.,1992)........................23
*United States v. Mejia*, 545 F.3d 179 (2nd Cir., 2008)..................................21,22

*Wechsler v. Hunt Health Systems, Ltd.*,
2003 WL 470330 at * 5 n.3 (S.D.N.Y., July 19, 2003)....................................9
*Whitney v. Wal-Mart Stores, Inc.*,
2003 WL 22961210 at *3 (D.Me., December 16, 2003)..................................16,17

**STATUTES:**

29 U.S.C §2601..........................................................................................17

**RULES:**

Fed. R. Civ. P. 26..........................................................................................4

Federal Rules of Evidence § 1006.......................................................................24

## I. PRELIMINARY STATEMENT

Crowding their application with misstated facts, picayune objections and choplogic Defendants propose to disqualify Glenn Pannenborg ("Pannenborg") as Plaintiffs' expert. Indeed, Defendants' grapeshot motion is but a checklist of all imaginable grounds for objecting to an expert, and gives each groundsuperficial coverage. Crowning Defendants' reasoning is the claim that Pannenborg's reports are nothing more than groupings of "simple mathematical calculations" and, as such, could not be admitted; this, despite a plethora of cases to the contrary.

Defendants' alternative to admitting Pannenborg's reports is to have the jury wade through Defendants' one hundred (100) plus exhibits, comprising of tens of thousands of pages of payroll documents, such as payroll journals, ledgers, paystubs and the like, in order to calculate damages for forty nine (49) Named Plaintiffs and the Class, if one were to be certified. Defendants' alternative would not only smother the jury with papers and data, but would make it neigh impossible to calculate damages at bar. Just this consideration alone suffices to admit Pannenborg's expert reports so as to assist the jury.

But more importantly, Defendants' liberal use of dramatic literary style (multiple adjectives and alliterations) and copious citations of inapposite cases cannot couch the paucity of their argument. Pannenborg's qualifications, the reliability and the relevance of his expert reports are not seriously in dispute, since no one can take seriously Defendants' degage claim that Pannenborg cannot be qualified as an expert at bar because (here it comes): he "has never been qualified as an expert.....or testified as an expert."

Defendants devote much effort to paint Pannenborg's reports as simply "basic mathematical calculations." In fact, Pannenborg's calculations, first and foremost, could only be

made owing to his substantial experience in reading payroll data and general knowledge of the construction industry and entailed, among others: (1) deriving the hours worked by Plaintiffs from Plaintiffs' recollection, Defendants' payroll records, and other documentary sources; (2) creating formulae that were entered into multi-tiered spreadsheets to calculate the damages; (3) reconciling inconsistencies within Defendants' payroll records or Plaintiffs' recollection, which he was able to do based on his experience in the field; and (4) performing various tests to verify that the damages were properly calculated. As is now obvious, rather than merely performing basic calculations, Pannenborg's report required knowledge beyond a layman's ken. In fact, because of the difficulties involved in preparing such calculations, other courts have permitted experts to prepare such reports even when the reports appeared to be nothing more than mathematical calculations, and in one case, even when the party offering the report himself admitted the report is nothing more than basic arithmetic calculations.

Another prominent objection Defendants roll out is that Pannenborg based his report on "multi-layered hearsay" because he in part distilled the hours Plaintiffs worked from client interview notes in order to calculate damages. But this is not the type of hearsay courts frown upon. Admittedly, courts tend to not admit out-of-court statements that cannot be challenged in Court, but all Plaintiffs will testify in court and will thus be subject to cross-examination. Should these workers' sworn testimony differ from the data provided during client interviews, Pannenborg will adjust his reports accordingly. As such, the information in Pannenborg's report derived from client interview notes is not hearsay.

Pannenborg also possesses sufficient qualifications to prepare the reports at issue. Pannenborg is a CPA with years of experience in reading and preparing payroll data and has a

general knowledge of the construction industry. Defendants do not dispute Pannenborg's experience but try to improperly deflect this Court's attention to issues such as Pannenborg's mistaken inclusion of a chemistry degree from 1979 in an outdated version of his resume and to two documents that he and Plaintiffs mistakenly did not produce as a result of trying to meet Defendants' ridiculous one-day deadline to respond to Defendants' subpoena.

There would also be no undue prejudice to Defendants if Pannenborg's reports were admitted. Pannenborg's reports, which calculate Plaintiffs' damages, are based on the hours Plaintiffs worked, which must be proven at trial and are not designed to "bolster" Plaintiffs' professed hours. Defendants assume that an overly credulous jury, comprised of individuals who will be dazzled by Pannenborg's expertise and will take his report as unquestioned fact, would fail to realize that Pannenborg's calculations are admittedly based on factual allegations that must be proven at trial. To the extent that the Court is concerned of this possibility, the Court can issue a limiting instruction to only accept Pannenborg's calculations if the jury is convinced by a preponderance of the evidence that Plaintiffs worked the hours they claim. Pannenborg himself has stated that he will modify his reports accordingly if any Plaintiff's testimony differs from the information he received.

## II. STATEMENT OF FACTS

### *A. Relevant Facts*

Plaintiffs brought this action on behalf of themselves and on behalf of all others similarly situated on December 5, 2006 for claims for unpaid wages and unpaid overtime pursuant to the FLSA, the New York Labor Law, and for breach of contract claims as third party beneficiaries of

prevailing wage contracts under the National Housing Act. In and around May 2007, Plaintiffs circulated a notice of pendency and a large number of new opt-in Plaintiffs joined this case. In and around October 2008, while the parties were engaging in settlement negotiations, fourteen (14) new Plaintiffs, who had not received notice of this case previously, expressed interest in joining this action. Between the original date of filing and the filing of the Fourth Amended Complaint, attached as Exhibit A to the Declaration of Kevin Schlosser, the number of Plaintiffs grew to the forty nine (49) Plaintiffs listed on Plaintiffs' Fourth Amended Complaint.

The history of the settlement discussions in this case is the following: on June 5, 2008, the New York State Court of Appeals ruled that workers are permitted to bring prevailing wage claims as third party beneficiaries of public works projects. ***Cox v. NAP Const. Co., Inc.***, 2008 WL 2276160 (Ct. Apps., June 5, 2008). This decision represented a split between the New York state courts, which permit workers to bring such claims, and the Second Circuit, which, pursuant to ***Grochowski v. Phoenix Const.*** 318 F.3d 80 (2nd Cir., 2003) does not allow such claims. Apparently realizing that Plaintiffs could potentially bring a concurrent action in state court for prevailing wages under ***Cox***, in and around July 2008, Defendants initiated what Plaintiffs believed to be settlement overtures. ***See***, Wisniewski Decl. at ¶4.

Settlement negotiations were a long process that spanned from July through December, when Defendants made an insulting settlement offer that reflected Defendants' obvious unwillingness to settle this matter. ***See***, Wisniewski Decl. at ¶4. At the time negotiations started Plaintiffs' counsel's law clerk, who has a degree in bookkeeping, had already prepared damages schedules for approximately thirty four (34) Plaintiffs in accordance with Fed.R.Civ.P.26, and these calculations incorporated Plaintiffs' prevailing wage claims. To prepare the calculations,

this clerk spoke with these Plaintiffs to find out how many hours they worked each day and for how many hours they were paid. At the time settlement negotiations began, Plaintiffs' counsel's office prepared damages calculations for four (4) additional Plaintiffs. Recognizing that the damages calculations for approximately thirty eight (38) Plaintiffs were becoming unwieldy, however, and wanting an expert to prepare the calculations, Plaintiffs retained Mr. Pannenborg to prepare damages calculations for all Plaintiffs for settlement purposes.

To assist Mr. Pannenborg in preparing his report, Plaintiffs made available to him all certified payroll records and other payroll records, including W-2 forms and payroll journals, that were produced by Defendants, deposition transcripts of Plaintiffs who Defendants deposed, and the then-operative amended complaint. ***See***, Wisniewski Decl. at ¶6. After reviewing these documents and the schedule of damages prepared by Plaintiffs' counsel's clerk, which was based on first-hand statements by Plaintiffs, and which Plaintiffs intended to introduce at trial as a summary of voluminous data, Mr. Pannenborg prepared a number of versions of the Settlement Report, tweaking the reports to accommodate Defendants' counsel's concerns. Given this Court's ruling in ***Sobczak et al. v. AWL Industries, Inc. et al.***, 07 cv 1226 (BMC)(RER), the parties negotiated on the basis of Plaintiffs' prevailing wages claims, and Mr. Pannenborg's settlement report included claims for prevailing wages.

In and around October 2008, eleven (11) of Defendants' former employees, who had not previously received notice of this action, expressed interest in joining for the first time. Rather than bring a separate action on behalf of these individuals, the parties agreed to include these potential Plaintiffs in settlement negotiations. To facilitate Mr. Pannenborg's calculations for these individuals, Plaintiffs' counsel met with them and prepared client intake notes, which were

then provided to Mr. Pannenborg in order to save time. Since the parties were seriously pursuing settlement, and because the parties were on a tight settlement schedule, Plaintiffs' counsel provided these intake notes to Mr. Pannenborg to incorporate their damages in his calculations rather than have Mr. Pannenborg meet with these clients directly. The notes listed the projects these Plaintiffs worked on, as well as the type of work they performed, which, given that settlement negotiations were being pursued based on ***Cox***, was of the utmost significance. ***See***, client intake notes, attached as Exhibit O to Schlosser Decl. In addition, since there were a large number of Plaintiffs, Pannenborg spoke to various Plaintiffs to elicit specific information for his report.

On December 16, 2008 settlement discussions came to a screeching halt at the settlement conference. After months of negotiations and multiple modifications in Pannenborg's report in response to Defendants' concerns, Defendants made a low-ball offer that made it obvious that Defendants were never seriously interested in settling this case in the first place. ***See***, Wisniewski Decl. at ¶12. The Court later set a schedule for trial, including a deadline for submitting the pre-trial order on February 12, 2009.

Subsequently, with the Court's permission, Plaintiffs moved to be permitted to bring their prevailing wage claims based on the prevailing wage rates included in the public works projects that Defendants signed, which the Court denied. The Court also denied reconsideration on January 31, 2009. Prior to the Court's decision, with the Court's permission, Plaintiffs filed the what-is-now the operative complaint on January 15, 2009 (See, Exhibit A to the Schlosser Decl.), and there are now forty nine (49) named Plaintiffs in this case. However, when reconsideration was denied on January 31, 2009, Plaintiffs decided to retain Mr. Pannenborg to prepare an expert

report on all Plaintiffs that was consistent with this Court's ruling dismissing Plaintiffs' prevailing wage claims.

Given that Plaintiffs had less than two weeks to submit a pre-trial order, by which time the expert report had to be prepared, Plaintiffs asked Pannenborg to adjust the Settlement Report to reflect only the claims that the Court allowed Plaintiffs to pursue. Since the joint pre-trial order, which was submitted on February 16, 2009, made clear that Plaintiffs intended to call all Plaintiffs to testify, the expert report was based on evidence which Plaintiffs expected to put on the record at trial.[1] Plaintiffs submitted this expert report, which included a schedule of damages, a summary of damages, and a methodology report to Defendants on February 16, 2009 ("February 16, 2009 Report"). Upon further review, Mr. Pannenborg realized that his report contained a number of minor errors, which he fixed, and resubmitted an amended report on March 12, 2009, which included a new methodology report ("Named Plaintiffs Report)." attached as **Exhibit 1** to Pannenborg Decl.

On April 1, 2009, Plaintiffs moved to certify the class and, in preparation of the impending deposition of Mr. Pannenborg, asked Mr. Pannenborg to prepare an expert report on the class damages. Mr. Panneborg's report took into consideration the claimed hours worked by the forty nine (49) Plaintiffs, who collectively are approximately a third of the entire class. The Plaintiffs, as a whole, performed all the types of work at virtually all the projects that Defendants contracted to perform. To prepare damages for the class, Pannenborg determined each class member's work classification based on the payroll produced by Defendants, and extrapolated

[1] The pretrial order, which is attached as **Exhibit 4**, listed the parties' exhibits for trial. It also records that Defendants intend to introduce over one hundred (100) exhibits, many of which contain hundreds if not thousands of pages. ***See*, *Id.*** at 34-46.

from Plaintiffs' experiences how many hours each class member worked, and accordingly, how much they were underpaid for each pay period. Although Pannenborg did not interview any class members to calculate their damages, he was able to ascertain their damages based on the work hours performed by their colleagues who performed the same work on the same projects and the wages paid to them by Defendants as reflected on Defendants' payroll records. Plaintiffs forwarded this report to Defendants on April 16, 2009 (hereinafter "Class Report") attached as **Exhibits G & H** to Schlosser Decl.

### *B. Discovery Provided by Plaintiffs and Pannenborg to Defendants*

Defendants served a subpoena on Pannenborg on March 12, 2009. This subpoena, which was composed of 38 requests, inexplicably had a March 13, 2009 return date. Defendants also served Plaintiffs with a copy of the subpoena on March 16, 2009 *after* the subpoena's return date. ***See***, **Exhibit 3** attached to Wisniewski Decl. Despite the short period of time by which to respond to Defendants' subpoena, Pannenborg made a great effort to produce as many documents as possible in the shortest possible time. By March 19, 2009, Pannenborg produced thousands of pages of documents to Plaintiffs, who forwarded them to Defendants, which were then collated in nine large binders that Defendants marked as Exhibit B at Pannenborg's deposition.

As a result of Defendants' impossible deadline to produce documents, Plaintiffs and Pannenborg inadvertently failed to produce two (2) documents. First, Plaintiffs did not produce the updated methodology report for the March 12, 2009 version of the named Plaintiffs report. Plaintiffs did timely produce the updated report, and subsequently did produce the March 12, 2009 methodology as soon as Defendants made them aware of this oversight. ***See***, May 26, 2009 email to Defendants' counsel, attached as **Exhibit K** to Schlosser Decl. Plaintiffs, however,

objected to producing this report methodology in Microsoft Word format because they were concerned that Pannenborg used the same template to prepare settlement reports in other cases and an unknown amount of confidential settlement information from other cases was contained therein. Defendants never raised this issue again between June 19, 2009 and July 27, 2009 when they filed their pre-motion letter with the Court.[2] Pannenborg also mistakenly failed to produce a declaration that he prepared in ***Ho v. Ernst & Young LLP***, 2008 WL 619029 (N.D.Cal., March 4, 2008). Plaintiffs, however, put Defendants on notice that Pannenborg was mentioned in the decision, and the decision repeatedly references a declaration prepared by Pannenborg. Since Defendants were able to locate the Court's decision and the reply memorandum in that case, Defendants obviously could have obtained the declaration from the PACER system with little effort. Pannenborg Decl. at ¶8.[3]

Finally, Plaintiffs objected to the production of Pannenborg's invoices for work performed on the authority of ***Wechsler v. Hunt Health Systems, Ltd.***, 2003 WL 470330 at * 5 n.3 (S.D.N.Y., July 19, 2003), which clearly states that invoices do not need to be produced if the expert has stated the total compensation he received in the case, which Defendants concede Pannenborg has done. Wisniewski Decl. at ¶21.

### *C. Pannenborg's Qualifications to Render an Expert Report*

As Pannenborg emphasized repeatedly throughout his deposition, he possesses significant

[2] Defendants claim they need the March 12, 2009 methodology report in native form in order to ensure that the methodology was not first prepared after Pannenborg was deposed. To assuage their concerns, Plaintiffs forwarded to them the original email from Pannenborg on March 12, 2009. ***See***, **Exhibit 5** to the Wisniewski Decl.

experience in using and interpreting financial reports, including payroll journals, W-2 forms and certified payroll records. Pannenborg is a licensed CPA in the state of New Jersey. Dep. Tr. 34:8-10. Mr. Pannenborg testified at his deposition that most of his professional career has involved interpreting and using payroll reports. Dep. Tr. 37:7-15. He is familiar with payroll records and W-2 forms, and understands how various payroll reports interact with one another. Dep. Tr. 39:5 -40:23. In particular, Mr. Pannenborg is knowledgeable about how to deal with discrepancies between the various reports, as well as discrepancies within a particular report itself. ***Id.***, Pannenborg Decl. at ¶13. In addition, for much of Pannenborg's professional career he has prepared financial statements for construction companies and, as a result, has expertise in the general principles of the industry. Dep Tr. 39:12-24. He has worked for a construction company (Dep. Tr. 41:17-22), has performed a variety of tasks for construction companies as a consultant (Id., Dep. Tr. 379:25-380:13) and has a strong understanding of the industry. Dep. Tr. 51:12 - 5:23. Pannenborg is also no novice when it comes to preparing damages calculations for FLSA cases. Pannenborg has prepared reports calculating damages under various wage laws, including the FLSA, in a number of other cases. Pannenborg Decl. at ¶12.

Finally, Pannenborg has great expertise in using Microsoft Excel to prepare multi-layered spreadsheets, which he used to prepare the report. Dep. Tr. 45:20-48:9. Given the large number of Plaintiffs, as well as the large class, there is simply no way for the jury, or anyone else for that matter, to prepare damages calculation without using some version of spreadsheet software.

### ***D. The Reliability of Pannenborg's Methodology***

In preparing his reports, Pannenborg reviewed Defendants' voluminous payroll records, including payroll reports, certified payroll records and W-2 forms for Plaintiffs (Dep. Tr. 39:5-

23), had Plaintiffs' counsel elicit information from Plaintiffs (Dep. Tr. 273:25-274:24), and reviewed the client intake notes (285:14- 286:13) and schedules of damages prepared by Plaintiffs' counsel. Dep. Tr. 182:22-183:15. From these records, Pannenborg ascertained the hours Plaintiffs worked, the hours they were paid for and amounts they received, and calculated the amount Plaintiffs were owed, including overtime, penalties and interest. In preparing the expert report, Panneborg extrapolated the hours worked by Plaintiffs, who make up approximately a third of the class and projected that data to the class. Dep. Tr. 307, Pannenborg Decl. at ¶6. As a group, Plaintiffs performed virtually the same tasks at the same project sites as the class, and Pannenborg reasonably assumed that the same rules that applied to the Plaintiffs applied to the class. Pannenborg Decl. at ¶6.

To ensure the accuracy of this reports, Pannenborg tested his reports in four (4) different ways (Dep. Tr. 371:20 - 372:24) one of which compared the results of his reports with the schedule of damages prepared by Plaintiffs' counsel's office. Pannenborg performed this test in order to ensure that the transcription of the payroll data onto the spreadsheet was accurate, but also as a means of ascertaining whether his report was mathematically accurate. Pannenborg performed other tests as well, all designed to test the accuracy and reliability of his calculations.

## III. ARGUMENT

### *1. General Principles*

This Circuit has determined that there is a "presumption of admissibility of [expert] evidence and a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable." ***Great Northern Ins. Co. v. Power Cooling, Inc.***, 2007 WL 4688411 at *6 (E.D.N.Y.,December 18, 2007) *quoting* ***Borawick v. Shay***, 68 F.3d 597, 610 (2d Cir.1995), *cert. denied*, 517 U.S. 1229, 116 S.Ct. 1869, 134 L.Ed.2d 966 (1996)(internal quotations omitted). A strict interpretation of the rules would run against the "liberal thrust" of the Federal Rules. ***Daubert v. Merrell Dow Pharm., Inc.***, 509 U.S. 579, 588 (1993).

In order for an expert to be certified, the court must conclude that he is qualified. ***Nisanov v. Black & Decker (U.S.) Inc.***, 2008 WL 906708 at *3 (E.D.N.Y., April 3, 2008))(Cogan, D.J.). If the expert is qualified, the Court must ascertain whether his testimony is relevant and based on reliable methods. ***Id.*** at *3. The Supreme Court has provided a number of non-exhaustive factors that courts may take into consideration when making this determination including: (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. ***Id.*** at *4 *quoting* ***Daubert v. Merrill Dow Pharm., Inc***, 509 U.S. 579, 593-94 (1993). Importantly, these criteria do not necessarily apply to all experts, and the district court is granted wide latitude to determine whether an expert's testimony is reliable. ***Id.*** at 4 *citing* ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 142 (1999).

### 2. *Pannenborg is Qualified as an Expert to Proffer an Expert Report*

Contrary to Defendants' feigned fulminations, Pannenborg is clearly qualified to offer an expert report. It is undisputed that: (1) Pannenborg is a Certified Public Accountant, (2) that he has extensive experience working with, and making reports from, payroll records; (3) that he worked at, and consulted for, a number of construction companies which provided him with a sufficient understanding of the construction industry and an understanding of the specific construction-related payroll reports and issues that arise in them; and (4) that he is proficient in the use of Microsoft Excel to prepare schedules of damages of the sort included in his expert reports.

What Defendants do dispute, however, is that preparation of the two reports Pannenborg prepared requires any specific skills beyond those possessed by a layman. Defendants disingenuously claim that *any* layman is capable of reading tens of thousands of pages of payroll registers, payroll reports, and W-2s; understanding such payroll documents; dealing with inconsistencies between the various payroll documents; knowing how to account for any corrections to payroll reports; and then applying that information to the facts at hand and preparing a complex schedule of damages for forty nine (49) named Plaintiffs and a class of approximately one hundred and fifty (150) individuals in a computer program, such as Microsoft Excel.

As Pannenborg details in his declaration and as he explained at his deposition, this is not so. A layman would have difficulty understanding how to compare varied and inconsistent payroll records. For example, as it is the case with Defendants' payroll records, often an employer's certified payroll records and payroll registers are inconsistent, and in such a

circumstance, the expert must determine which report is more reliable and that decision can only be based on experience in the industry.

Further, as Pannenborg details in his declaration, payroll reports often contain quirks that are not easily understood. For example, if a payroll report is corrected, the correction is not easily identified. Often if the payroll journal fails to reflect that an employee performed work one week, and rather than amend a previous week's data, the preparer of the payroll report will usually incorporate the data in the subsequent week. To the untrained eye, the report will appear to state that the employee worked more hours in the subsequent week than he actually did, and it may appear that he was underpaid for that time, but the knowledgeable observer will understand that the hours recorded that week were for work performed over two weeks.

Defendants also claim that any layman can create multi-layered spreadsheets in an "off the shelf" version of Microsoft Excel. Mischaracterizing Pannenborg's testimony, Defendants allege that Pannenborg merely transcribed the data into a spreadsheet and Microsoft Excel performed the calculations for him. Defendants' memo at 10-11. What Defendants glibly fail to recognize, is that Microsoft Excel does not come with preprogrammed data functions to prepare payroll reports. Rather, someone must create the formulae or methodologies that Excel uses to generate the output and *that* is the methodology that Pannenborg used to prepare his reports, which is more akin to programming than basic arithmetic. Dep. Tr. 48:3-9. Using his experience in preparing and reading payroll reports, as well as his understanding of Excel, Pannenborg first created mathematical formulae and, based on these formulae, then created multiple, interconnected spreadsheets to prepare the calculations for his reports.

In addition, contrary to Defendants' contentions, Pannenborg clearly has relevant

experience by virtue of his knowledge of the construction industry. It is well established that an expert need not have knowledge of the precise field that is the subject matter of the dispute. ***Nisanov***, *supra*, 2008 WL 906708 at *3 (collecting cases). Defendants disingenuously cite from Pannenborg's deposition to support their claim that he had no specialized knowledge. Dep. Tr. 59:7. While Pannenborg's knowledge cannot be pigeonholed into a specific discipline, Pannenborg's knowledge is not the type of knowledge possessed by a layman. Rather, a CPA preparing financial documents in the construction business, which Pannenborg has done, must have, as Pannenborg states, a "basic understanding of the industry...." (Dep. Tr. 58:7-8) even if that understanding is not a formal sub-discipline of accounting. ***See***, Pannenborg Decl. at 12. And because preparing damages calculations for work performed by a plumbing company requires reading general payroll reports and not some reports specific to plumbing work, Pannenborg did not need to have a particular understanding of how plumbing work is performed.[4]

Finally, the fact that Pannenborg has not written any articles or given any seminars does not make him unqualified and Defendants, unsurprisingly, do not proffer any authority in support of that proposition. Publishing articles or giving seminars is hardly dispositive of whether an expert is qualified. Courts have permitted experts to testify when they had not published anything, held no seminars, or even had a high school degree. ***King v. Brandtjen & Kluge, Inc.***, 2001 WL 1804345 (W.D.N.Y., June 20, 2001).

---

[4]Never mind, as Pannenborg pointed out, that the vast majority of Defendants' employees did not actually perform plumbing work. Dep. Tr. 377:23-378:11.

### *3. Pannenborg's Reports are the Type Susceptible to Expert Testimony*

Defendants allege that the reports are squarely within the ken of lay knowledge, since they are "merely [] mathematical calculation[s]." ***See***, Defendants' Memo at 13. Yet, courts have allowed expert reports that perform what might be considered basic arithmetic when the calculations go beyond the jury's experience. ***See, e.g., Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC***, 2009 WL 875553 at *11-13 (E.D.N.Y., March 20, 2009)(finding an expert report admissible despite Defendants' contention that the expert performed "simple arithmetic calculations"); ***MacQuesten General Contracting, Inc. v. HCE, Inc.***, 2002 WL 31388716 at *2 (S.D.N.Y., October 22, 2002)(allowing expert report that performed damages calculations that "is hardly limited to the type of straightforward computation that would necessarily be within the experience of the jury."); ***Ayers v. SGS Control Services, Inc.,*** 2007 WL 3171342 at *1 (S.D.N.Y.,October 09, 2007)(admitting expert calculations of damages even though they merely summarized and made inferences from facts that the expert had no personal knowledge of); ***Square D Co. v. Breakers Unlimited, Inc.***, 2009 WL 1468700 at *1 n.1 (S.D.Ind., May 21, 2009)(finding that expert report produced by expert whose "role was primarily one of making mathematical computations" is admissible because the calculations "are complex enough that it is preferable to have them performed by an expert rather than relying on the mathematical prowess of the jurors."); ***Whitney v. Wal-Mart Stores, Inc.***, 2003 WL 22961210 at *3 (D.Me., December 16, 2003)(finding that an expert report should be allowed, in part, because expert had familiarity with payroll records).

***Whitney*** and ***Milton*** are particularly relevant. In ***Whitney***, *supra*, 2003 WL 22961210, plaintiff alleged that he was fired for taking medical leave in contravention to the Family Medical

Leave Act, 29 U.S.C. § 2601 *et seq.* Whitney alleged that his damages included, in part, lost future bonuses. Recognizing that the expert had "familiarity with payroll codes and the computation of employee benefits [that] is beyond that common to untrained members of the public" the court admitted his expert report. ***Id.*** at *3.

In ***Milton***, *supra*, 2009 WL 875553, plaintiff alleged a breach of contract for a joint venture by defendant. The alleged contract purportedly created a joint venture between the parties, and when defendant allegedly failed to keep its end of the bargain, plaintiff brought an action to recover damages. Plaintiff hired an expert to calculate his damages, which were the lost profits from the deal. Since the expert did not have an independent understanding of the alleged contract, and received all his underlying facts from plaintiff, defendant moved to exclude the expert report because it was based exclusively on facts provided to the expert by plaintiff. In response, plaintiff plainly admitted that the expert did not need to understand the contract, because the expert merely "determined the dollar value of damages based upon the dollar volume of the business conducted by the parties by performing simple arithmetic calculations that did not require complex knowledge to which the rigors of the *Daubert* test would apply." ***Id.*** at *11 Yet, despite plaintiff openly admitting that the calculations performed by his own expert was nothing more than simple mathematical calculation, the court nevertheless admitted the report under Daubert. ***Id.***

Defendants' reliance on ***Powell v. Carey International, Inc.***, 2007 WL 1068487 (S.D. Fla., April 9, 2007) is unsupported. Although ***Powell*** seems superficially similar, there is a significant difference the report prepared and ***Powell*** and Pannenborg's report: the expert in ***Powell*** ignored the law of the case and calculated the plaintiffs' FLSA damages while blatantly

ignoring the already-made legal determinations decided by the Court. As the court stated "because [the expert's] legal assumptions are at odds with the law of the case, his wage calculations are not applicable to the disputed issues in this case." ***Id.*** at *3. An apt analogy would be if Pannenborg had calculated Plaintiffs' damages based on the prevailing wages despite this Court refusing to permit Plaintiffs to include prevailing wages in their damages.

Although the ***Powell*** court, in dicta, indicated that the damages calculations prepared by the expert were simple enough that the jury could perform them with a calculator, at bar there are almost fifty named Plaintiffs, many with years of claims, and well over 100 class members. For the jury to prepare these calculations, they would have to review various types of payroll documents that count in the thousands of pages, compare the documents to Plaintiffs' testimony, and create formulas to calculate the damages on a spreadsheet creating software. Even then, they would likely make errors, in part, because their lack of experience with payroll documents would leave them bewildered about how to reconcile inconsistencies in the documents or calculate damages for an individual who performed different tasks, and therefore was paid various rates, during a single pay period.

At bar, the calculations performed by Pannenborg in his March 12, 2009 Report and the Class Report are much more than "simple mathematical calculations" and are precisely the type of calculations that should be performed by an expert and not the jury. Pannenborg, who is a CPA with a thorough understanding and experience in reading and understanding payroll reports and quite proficient at using spreadsheet-producing software, took a significant amount of time reviewing Defendants' payroll records and preparing these calculations – almost two (2) weeks despite being able to base the reports on previous settlement reports. Defendants apparently

expect the jury to pore over Defendants' one hundred (100) plus exhibits that will be introduced at trial, ascertain which data are relevant, and then perform the damages calculations for the forty nine (49) Plaintiffs and a class of approximately one hundred and fifty (150) members by using a calculator or obtaining, on the fly, an advanced knowledge of Microsoft Excel or a similar program.

### *4. Defendants Do Not Question Pannenborg's CPA Designation and Pannenborg's CV Was Substantially Accurate*

Defendants wish to disqualify Pannenborg because a discrepancy arose concerning advanced chemistry courses Pannnenborg took, as a gifted teenager, at Ohio State University some thirty (30) years ago. Defendants, however, do not question Pannenborg's accounting degree, his CPA designation or Pannenborg's financial experience, which are relevant to Pannenborg's ability to produce his reports and be certified as an expert.

While Pannenborg's original CV included a degree in chemistry from 1979 that he did not qualify for, the fact that an expert engaged in "resume puffing" should not be a basis for disqualifying him. ***Smith v. Jacobs Engineering Group, Inc.***, 2008 WL 1805373, (N.D.Fla., April 18, 2008)(finding that expert included false information on his resume, but that he should not be disqualified on those grounds). Pannenborg's CV submitted as part of his expert report did not list that degree and Pannenborg admitted he did not have such a degree even before Defendants' counsel showed him the earlier resume at his deposition. Dep. Tr. 72:4-9. In addition, as Pannenborg explained in his revisions to his deposition transcript, he prepared the original resume in 2003 and is unsure how the offending entry ended up on the resume.

What is clear, however, is that Pannenborg did not expect this resume to "bolster" his credibility for a number of reasons. First, he did not include any degree from Ohio State on his

CV that was part of his updated report. In addition, Pannenborg attended the Ohio State chemistry program thirty (30) years ago, and what he learned there is entirely irrelevant to the preparation of his reports at bar. As such, any alleged misstatements by Pannenborg go to his credibility and not his qualifications and should be left to the jury to weigh. ***Tewksbury v. Dowling***, 169 F.Supp.2d 103, 112 (E.D.N.Y., 2001)(finding that expert had worked for plaintiff in the past and that his prior and current testimony contained inconsistencies was an issue of credibility that should be left to the jury). Defendants are free to hire their own expert to challenge Pannenborg's conclusions.

### ***5. The So-Called Hearsay Evidence Does Not Undermine Pannenborg's Reports***

Defendants take issue with Pannenborg's partial reliance on damages calculations prepared by Plaintiff's counsel's clerk with an accounting degree and on client intake notes sent in by Plaintiffs' counsel. But Pannenborg's reliance on so-called hearsay statements is not a bar to the admissibility of his testimony. In fact, as Defendants recognize, experts often rely on reported statements rather than first hand evidence in making their reports. ***MacQuesten General Contracting, Inc. v. HCE, Inc.***, 2002 WL 31388716 at *2 (S.D.N.Y., October 22, 2002). Defendants, however, incorrectly allege that Panneborg merely "regurgitated" Plaintiffs and their counsel's statements without applying any expertise whatsoever. But as stated above, while Pannenborg did, of course, base his reports on the schedules prepared by Plaintiffs' counsel's office, on client intake notes taken by Plaintiffs' counsel, and meetings with some named Plaintiffs, Pannenborg's reports are more than just a restatement of what he was told. In preparing his named Plaintiffs report, Pannenborg applied his expertise to the facts and

calculated damages based on Plaintiffs' recollections of their hours, reconciling inconsistencies in their recollection and Defendants' payroll records. Pannenborg's class members' report involved significantly more expertise as Pannenborg extrapolated the hours of Plaintiffs – who make up a third of the entire class and collectively performed the same work at the same projects as the class – and based on his findings applied this sample to the class. This report surely required doing far more than merely "regurgitating" Plaintiffs' statements.

In addition, what Defendants deem hearsay are the statements of Plaintiffs, all of whom are expected to either testify at trial or will have their deposition transcripts admitted into evidence. First, it is not usual for reports to rely on facts that must be established at trial. ***Milton***, *supra*, 2009 WL 875553 at 13 (finding that although the factual basis of the expert's report came exclusively from one party, those facts will need to be established at trial). To the extent that some of the facts came exclusively from Plaintiffs, that so-called defect goes to the weight of the report and not its admissibility. ***Id.***

More importantly, the type of hearsay that courts find problematic is out-of-court statements by individuals who are not available for cross-examination. ***See, e.g.,United States v. Mejia***, 545 F.3d 179 (2nd Cir., 2008)(ruling that an expert's testimony that merely repeats statements by law enforcement personnel and articles he read should not be admitted). The rationale behind this rule is self-evident: the hearsay cannot be repeated in court "because it enables [a party] to put before the jury an out-of-court declaration of another, not subject to cross-examination ... for the truth of the matter asserted" ***U.S. v. Lombardozzi***, 491 F.3d 61, 73 (2nd Cir., 2007)(internal quotations omitted). At bar, Plaintiffs will be testifying at trial and Defendants will have ample opportunity to cross-examine any Plaintiff (and have had the

opportunity to depose each of the Plaintiffs). Accordingly the concerns that animate cases such as ***Mejia*** are not relevant here.

### *6. Pannenborg's Reports are Reliable*

Attempting to impugn the reliability of Pannenborg's reports, Defendants contradict themselves when they claim that his reports are not based on any reliable method used by other experts. Yet, Defendants have consistently claimed that Pannenborg's reports involve "simple mathematical calculations" that can be performed with anyone with a calculator. Surely, by Defendants' reasoning, such a simple methodology is often used to calculate damages by laymen and experts alike.[5]

Defendants also claim that Pannenborg improvidently exercised his discretion by applying the recollection of the majority of the Plaintiffs and by not crediting Defendants for the overtime that was reflected on their payroll records. First, the first allegation is simply untrue. As the Pannenborg declaration reflects, Pannenborg did, in fact, credit Defendants for overtime when their payroll records reflected that they paid overtime. Defendants fail to point to anything in either the March 12, 2009 Report or the Class Report that would indicate otherwise. Pannenborg, did, however, note that Defendants' payroll often related overtime payments of less than one hundred and fifty percent of the employee's regular rate, but used his discretion in

---

[5] Defendants also misrepresent Pannenborg's methodology. Claiming that Pannenborg admitted that he never previously used the same methodology to arrive at "hours worked," Defendants allege that Pannenborg's methodology is unique and should be discarded. But as Pannenborg explains in the declaration attached hereto, his methodology to determine hours worked, while different than methodologies used in reports in other cases, involved a greater level of independence. See, Pannenborg Decl. at ¶18. For example, rather than just accepting Plaintiffs' counsel's start times as true Pannenborg relayed questions for the named Plaintiffs to Plaintiffs' counsel, as well as resolved inconsistencies. Id. at ¶21.

Defendants' favor and still credited Defendants with the overtime payments in those instances. Pannenborg Decl. at ¶29.

To the extent, however, that Pannenborg made errors or unfounded assumptions in his reports, that goes to weight of the report and not its admissibility. ***MacQuesten***, *supra*, 2002 WL 31388716 at *2. In fact, courts exclude expert testimony that is "speculative or conjectural, or if it is based on assumptions that are so unreasonable and contradictory as to suggest bad faith" but not testimony that is based on disputed assumptions. ***Olindo Enterprises, Inc. v. City of Rochester***, 2008 WL 6862594 (W.D.N.Y., 2008) *citing* ***Boucher v. Suzuki Motor Corp.***, 73 F.3d 18, 21 (2nd Cir.,1996).

7. ***Defendants' Claim that the Jury would be Unduly Prejudiced is Unsupportable***

Defendants invoke Fed.R.Evid 403 as a basis to exclude Pannenborg based on "undue prejudice." Defendants are concerned that having Pannenborg, a CPA, repeat Plaintiffs' claims in an expert report may bolster those claims. But this Circuit does not have such a negative view of the jury. ***United States v. Jakobetz***, 955 F.2d 786, 797 (2nd Cir.,1992) (rejecting the assumption that a jury of this district "will be so dazzled or swayed" by expert testimony "as to ignore evidence "suggesting that an experiment was improperly conducted or that testing procedures have not been established"). To the extent that the Court is concerned that the jury may take the "hours worked" part of Pannenborg's reports as fact, the Court can issue a limiting instruction to the jury to only accept the calculations performed by Pannenborg for a particular Plaintiff if the Plaintiff verifies the hours he worked. ***See, Hnot v. Willis Group Holdings, Ltd.***, 2007 WL 1599154 at *3 (S.D.N.Y., June 1, 2007)(finding that potential jury confusion can be limited by a limiting instruction to the jury).

Additionally, Pannenborg's reports will significantly aid the jury in calculating damages. Since Plaintiffs will likely prove that they worked the additional hours they have claimed, the jury will be not be forced to pore through tens of thousands of pages of documents to calculate Plaintiffs – and the classes' if Plaintiffs' motion to certify the class is granted – damages. This assistance is far from trivial and will greatly assist the jury in deciding the outcome of this case.

Finally, to the extent that this Court feels that Pannenborg's report is not admissible as an expert report, Plaintiffs respectfully request that it be admissible as a compilation pursuant to Federal Rules of Evidence § 1006 and permit Mr. Pannenborg to authenticate the compilation.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this Court issue an order:

(a) denying Defendants' motion in the entirety and permitting Glenn Pannenborg to be qualified as an expert and allowing his reports into evidence; or

(b) in the alternative, permitting Pannenborg's March 12 Report and the Class Report to be admitted as summaries of voluminous data under Fed. R. Evid. 1006; and

(c) whatever relief the Court deems just.

Dated: New York, NY
August 21, 2009

Respectfully submitted,
---------------/s/--------------------
Robert Wisniewski (RW-5308)
Counsel for Plaintiffs